Madam Clerk, would you please call the last case of the morning? Ron Knezevich, case number 316-0208, Ron Knezevich v. Martin Knezevich. Counsel, you may proceed. Good morning. May it please the Court, counsel, my name is Tyler Burberich, I represent the petitioner Ron Knezevich in this case. After arbitration in this case, Your Honors, the arbitrator entered a decision that awarded temporary total disability benefits, maintenance benefits, an award of payment of medical bills related to the petitioner's lower back, and a permanent total disability. Respondent filed an appeal to the Commission, and the Commission stripped the petitioner of the permanent total disability, and awarded a 25% loss of use of the body as a whole. We ask that this Court reverse the Commission decision, and restate the permanent total disability award made by the arbitrator, or in the alternative, find that the petitioner is due wage differential benefits, and remand the case to the Commission for calculation of those benefits. This case involves an accident that the petitioner sustained while he was working on light duty for the respondent. He had originally sustained an injury to his left hand in June of 2006. After some treatment for that, he returned to light duty for the respondent on August 4 of 2006. While working with one uninjured hand, the petitioner was lifting a bottle of rebar that got stuck, felt a snap in his back, and immediate pain down the leg. The petitioner began treatment with Dr. Makum Komandori. He underwent an extensive course of treatment that involves a lot of physical therapy and injections. Along the way, he was seen for five separate IMEs that he was sent to for the respondent. Four of those were with Dr. Edward Goldberg, and one with Dr. Avi Bernstein. Eventually, during this time, the petitioner was also treating for his injured left thumb, which he had injured in the June 2006 injury, which was a consolidated case to this one. The petitioner was eventually sent for an FCE in January 2009, and on February 12 of 2009, the petitioner was first released with permanent restrictions by his hand surgeon, Dr. Leah Urbanowski. Later, Dr. Goldberg and Dr. Komandori both agreed that the petitioner should be released with permanent restrictions, permanent January 30, 2009 FCE, and those restrictions were causally related to his August 14, 2006 lower back injury. Now, after being released with permanent restrictions, the petitioner began a job search. Well, therein lies the problem. That's where, apparently, from your perspective, the train went off the track. Corey, you're alleging or claiming that he falls into the outline category, right? That's correct. One of the things, as you alluded to, you have to show a diligent job search. And the commission called it farcical. They had a real problem with the claims job search. One of the things they pointed out, too, that in all these extensive records he tendered, they're saying that at no time during his job search did he intend to locate or apply for a place that was actually hiring. So what do you have to say to that alleged deficiency? I would say that 280 of the employers that he applied to, he specifically marked on his logs hiring. He filed 1,079 job contacts, and 280 of those he specifically marked as hiring. The commission had no evidence to make that kind of claim. The only vocational evidence in this case is the petitioner's job search, the petitioner's testimony, and the testimony from Susan Entenberg, who found this job search to be diligent. That is the only vocational evidence in this case, and the commission has frankly dismissed it all, based on a number of irrelevant or unsubstantiated things. Did the commission have any problems with the claimant's credibility? The commission cited a number of issues that they had with the claimant's credibility. However, Your Honor, as we detail in our brief, the commission based those findings on impermissible inferences. They based those findings on irrelevant evidence to this case. For instance, Your Honor, the commission cites a number of times a Social Security disability finding in the 90s, which the arbitrator found at hearing was irrelevant to this case. The basis of that Social Security finding was irrelevant to this case. The commission cites a divorce decree from the 90s, which also was irrelevant to this case. It has detail by the arbitrator. They cite a number of issues with the petitioner's testimony and with the evidence in this case that they had to go out of their way to find these impermissible inferences about this evidence. They ignored it. Well, just in general, when a commission weighs somebody's credibility in the way to be given to their testimony, are there certain limitations specifically on how they assess the credibility? All of these things you say they consider were completely legally irrelevant? Your Honor, the divorce decree and the Social Security decision the arbitrator found at hearing were irrelevant to the current case. They had nothing to do with the petitioner's lower back. They in no way affected his permanent restrictions or what's going on with his case now. And he found that they were irrelevant. The commission relied on those heavily throughout their decision. Can we agree on one thing? In all reality, seriously, isn't the assessment of credibility of a testifying witness sort of a subjective thing anyway? It is in a number of ways a subjective thing, Your Honor. I talk about his manner while testifying motives. I mean, there's a lot of things that go into it. It is sort of subjective. But the witness doesn't go on a, you know, on a polygraph, do they, when they're on the witness stand? They do not. And they do have the manner in which they testify is something that is noticed. And frankly, that's why the arbitrator said four or five times in his decision specifically that he found this man to be very credible. He watched the guy testify. But the commission in this case makes the ultimate determination. You're correct, Your Honor.  They can't base their decision on possible or speculative circumstantial evidence. What would you call the evidence that they were speculating on and circumstantial that would be insufficient to make the credibility finding? Sure. A couple of things, Your Honor. One of the things the commission points to is that this petitioner had a previous disputed workers' compensation case. The commission back in the year 2003, he had gotten some restrictions from an F.C.E. in 2000. The commission found that his testimony regarding being able to get better after that F.C.E. was not credible. Despite the fact that his treating physician from that time, Dr. Colman Dury, testified, he did in fact get better. And Dr. Colman Dury did release him to permanent, or I'm sorry, did release him to full duty work in 2003. He worked for three years at full duty iron work before going to work for the respondent in 2006. The commission still finds his testimony not credible even though the only evidence in this case about that F.C.E. and about him getting better shows exactly what the petitioner testified to. The commission also points to a conversation that the petitioner had with one of his treating physicians after he sustained his second work injury, and says that he lost his temper with one of his treating physicians, and that that weighs against his credibility. In eight years of treatment, this man lost his temper once, and it was after he sustained a serious back injury. How that affects his credibility about his restrictions or about his job search or about anything else, the commission doesn't explain. They simply go through a number of pinpoints they get out of the record and say, we find that this negatively affects his credibility, without the medical evidence or without any vocational evidence supporting that. The medical and the vocational evidence in this case show that this man is permanently, totally disabled. And at a minimum, your honors, the medical and vocational evidence show that he has at least sustained a wage loss. The commission, even if they do criticize his job search, the petitioner, pursuant to gallium ethyl, which I know you just heard a number of things about, does not even require that the petitioner undergo a job search. It's just one of the ways he can show a loss in his earning capacity. And the petitioner in this case, through the medical evidence which shows he has permanent restrictions from his August 14, 2006 work injury, the only vocational evidence, which is from Susan Ettenberg, show that he did have a loss of earning capacity, and that he is unable to return to his work as an iron worker because of his August 14, 2006 work injury. Your honors, the commission decision is rough with error. But one of the primary things I wanted to just discuss with this court is the commission's dismissal of the opinions of the petitioner's treating physician, Dr. Coleman-Durie. And the commission itself explains that the reason that it dismisses Dr. Coleman-Durie's opinions is because he hadn't seen the divorce decree from the 1990s, and he hadn't seen the petitioner's social security decision from the 1990s before he testified. Those had nothing to do with Dr. Coleman-Durie's medical opinions. Dr. Coleman-Durie, even during his testimony, after seeing those documents testified, those don't change his medical opinions. He still has permanent restrictions from his August 14, 2006 work injury. Those permanent restrictions are positively related to the injury. Based upon those permanent restrictions, he can't go back to work as an iron worker. The commission in its decision also completely loses track and doesn't even discuss the opinions of Dr. Edward Goldberg in its reasoning portion of its decision. This is a doctor that the respondent had write four IME reports on the petitioner. All four of those times, the doctor said he has a lower back condition that was caused by August 14, 2006 work injury. That lower back condition led to permanent restrictions every time. And the only vocational evidence in this case is that those permanent restrictions knock him out of his trade and that he is permanently totally disabled because there's no reasonably stable labor market for him. The commission's decision ignores the vocational evidence. It states that they declined to accept the vocational evidence. And that was because they questioned the petitioner's job search. The only evidence in this case that is from Susan Ettenberg that says the petitioner's job search was diligent. She's the only vocational counselor who was involved in this case, and that was her opinion, and it was very clear. The commission says the petitioner didn't apply to open jobs when he applied to 280 at least open jobs. They say that he applied to the same job more than once, which is a natural thing to do when you're applying for jobs within your area. You apply to 1,079 jobs. You're going to hit the same place more than once at some point. Those things are going to happen. The commission drew these facts out and specifically went out of its way to make inferences against the petitioner in this case, despite the medical evidence, despite the vocational evidence. And their decision is against the manifest weight of the evidence. Now, we would ask that this court reverse the decision of the commission and reinstate the decision of the arbitrator. And in the alternative, at least find that the petitioner is entitled to a wage differential, which all the vocational and medical evidence in this case show that he is, and to remand the case to the commission to calculate that wage differential. Are there any questions? Thank you, Counselor. Counselor, you may respond. Thank you. Good morning, Mr. Bergerich. May it please the Court, my name is Paul Coghlan. I represent Martin-Semitism. I think Mr. Bergerich did an excellent job of pointing out evidence in this record that the commission could have relied upon to rule differently than they ruled in this case. He pointed out the testimony of Susan Entenberger. He pointed out the testimony of some of the other doctors involved. The problem with the counsel's argument, of course, is that the commission didn't rule that way, though. The commission ruled and found Dr. Bernstein, the employer's expert, credible. Dr. Bernstein testified that this gentleman didn't have any condition which would have recluded him from going back to this job, the same job that he was performing. The commission also, as Justice Hudson pointed out, the commission also found this gentleman was not credible. And there was substantial evidence in the record supporting not just the commission's determination, but also supporting inferences the commission drew or could have drawn based upon the evidence in the record, not the least of which was evidence that this gentleman was gaining the system. And it's interesting that the commission used that phrase in its decision because that phrase is also aided by the petitioner himself when asked, why did you go back to work, and he said, I want to get back in the game. He referred to this as a game. And the use of the word farcical in the commission's decision as to the job search was strong language. How would you characterize the evidence that supported the word farcical? Well, I think that the commission was offended from what appeared to be obvious manipulation going on in this record. For example, when this gentleman goes to his own doctor, he explodes at his own doctor because the doctor was getting ready to release him to return to work, and this is not my doctor. This is his own treating doctor wrote right in the record that this appeared to be rehearsed and he just happened to have the name of another doctor he wanted to send him to handy when that happened. Look at the last case. Counsel, let's talk about the job search. Again, it looks, and I think the commission's correct, it looks like somebody just opened up the phone book and started writing down the names of the employers. There's, you know, they're all done and it looks like it's done in a day or two. This isn't something that's, it looks like somebody said, I need you to compile a list of a bunch of employers. It looked like he was going through the motions simply for the case as opposed to actively, sincerely attempting to find work. And again, the lack of sincerity is a theme that runs through this evidence. I didn't create it. You know, counsel seems to, you know, right to this brief, somehow I got smacked, the commission, into believing, you know, my science. No, they were persuaded by the evidence in this record. They were persuaded by what was right there in the documents. And when counsel suggests, for example, he wants you to believe, oh, he got better after the Megasteel case, even Dr. Commodore released him to go back to work, that does not jive with reviewing the contract for the Megasteel case before the ink was almost dry on that contract. Six weeks after to the day after that contract was signed, he's back to work full duty. Six weeks. There are no medical records saying that he had some type of miraculous recovery. We have no evidence that he tried the lords in those six weeks. Well, can I ask you a question? Just because he gained the system on the first case, what makes you think he isn't disabled in the second case? Because he's doing the same exact stuff here. The same stuff here. The manipulation, the phony job search records, you know, and it's okay to plead in the alternative, but to say, oh, you know, I'm permanently, totally disabled. If I'm not that, well, at least I'm on a wage differential. I mean, it looks like somebody throwing stuff up against the wall and playing the game and seeing what sticks as opposed to having a sincere injury with sincere treatment that can be judged in a sincere way. He lost his credibility in front of the commission because of things he did. Because of things he did and, you know, when you keep having, you know, a claim that you can't go back to work and then you keep going back to work, the commission has an obligation and a duty to defend itself from people that would gain the system. That's, you know, courts have to defend themselves from people that would do it. They are out there, unfortunately. And they, in this case, and I can correct myself, came to the conclusion that this gentleman was doing just that. He was, you know, playing the game here, maybe not with all of the case, but certainly with aspects of it. Well, I mean, look, there's no question that he received this award in the first case based upon his inability to go back to work as an iron worker and within a very short period of time, that's exactly what he does do. He made you on the first case. But the fact of the matter is, is there any dispute he was injured in the second case? Yeah. Dr. Bernstein said he had no permanent injury as a result of that. The only thing he did have... Well, what did the commission decide? Pardon? The commission decided he was injured out of his shoulder disability. Dr. Bernstein's opinion, the commission said he does have some residual disabilities, but they didn't attribute them to this case. They acknowledged that those FCEs that I put in evidence from the prior knee injury, from the prior shoulder injury, those injuries didn't just go away when this man showed up on a job site. Well, did they deny him all benefits based on his inability to prove either accident or causation? Well, they gave him, I thought, a generous amount of benefits. That's not my question whether you think it's generous or not. My question is, did they deny him benefits based on no accident or lack of causation? And the answer to that is no. They gave him benefits. They did. So they had to have found that he was injured out of and in the course of his employment with your client. And was capable of going back to doing the same job that he was doing at the time of the injury. And they didn't say that he was doing it unrestricted. They seem to be suggesting that he may have had some restrictions not pertaining to this accident, but just having a collective from all of the other things he's been through over the years. They didn't buy this, you know, portrait of him working unrestricted. They didn't buy that. And counsel wants you to look at the FCE studies done, but just on this case. They don't want you to look at the ones in the other cases. They want you to assume once that case is over and if he really shows back up on the job search and if he testifies, oh, I got better, we're supposed to forget it all. Even though those tests are specifically designed to tell us what permanent disabilities exist. What permanent disabilities he had from all those other injuries. So he's arguing two different things. He's saying, oh, no, the minute the case is over, all my permanent injuries go away. The commissioner will recognize that. That that is just, that just didn't happen here. He certainly had some limitations from the prior stuff he had. I mean, the shoulder, the operated shoulder, the operated knee, there would be some residual disability. So the commission did give him, they did give him a permanency award here. But they refused to give him a wage differential because they recognized that he was no better or more, more or less capable of performing the same job, just like Dr. Bernstein testified to, after this accident than he was before the accident. Or in other words, stated differently, he could have gone back to it if he wanted to. He used his own phrase, do the Marine thing and get back in the game again. If he wanted to get back in the game again and be with the tough Marine, they ruled he could have done it if he wanted to, but he didn't do it. And he would never do it. And why is that? Because the case was still going. He never goes back to work. Just like he told Randy Stark at the beginning of this case, he has some, when he talked to the petitioner, he said that I know how, this petitioner's own words, I know how this game works. You get me back to work and then I settle for peanuts. Well, it ain't going to be like that. That sums up the whole case right there. That one quote sums up everything that's happened. Everything is consistent with the documents, consistent with what the commission found. And say what you want of a map that's waiting, no matter who wanted an office case, let me tell you, there was a lot of evidence on both sides there. No matter how the case was decided, there would have been evidence to support whatever way the commission went because both sides spent a lot of time putting their respective sides on. I can see that. Can I ask you a question? Excuse me. Can I ask you a question? Yes, sir. You say that they awarded him 25% loss of use of the man as a whole, and you say the petitioner's argument centers upon the alleged loss of trade and that he can no longer work as an iron worker. Now, the commission specifically says in this thing that they relied upon his FCE from 2009. His FCE from 2009 says he can't work as an iron worker. And yet he goes back to work. Well, wait a minute. That's not the point. That's not the point. The point is, is he capable of going back to working as an iron worker after this injury? And it occurs to me that it's a little contradictory to say we're going to rely on the FCE of 2009 and Dr. Bernstein's opinion that he can't work as an iron worker and then turn around and say we're going to deny him a wage differential and we're going to deny it because it centers upon the alleged loss of trade and that he can no longer work as an iron worker. He's apparently made similar allegations in the past, yet he's consistently returned to work as an iron worker. Now, either he can work as an iron worker or he can't. The specific evidence supporting the commission's denial of a wage differential, I would point to, number one, Dr. Bernstein. Clearly, Dr. Bernstein said he could go back to the same job, and he attributed the FCE that he referred to and all of the other evidence such as it is suggesting there's a permanent disability, he attributed those to prior injuries. And, of course, with the petitioner and with his lack of credibility, he wasn't going to volunteer what those disabilities were related to those prior jobs. That's precisely what the commission is driving at. So, Justice Hoffman, I think to a certain extent I agree with you. I had a difficult time explaining exactly why he couldn't go back to that job because of the prior injuries because this gentleman refused to tell us what those were. Instead, he went back to the same old story, the same story he tells in every case, whether it's disabled during his divorce case, he couldn't pay for child support, or whether it was during the magazine case, he couldn't go back to work. As soon as the case is over, he goes back to full duty, and he says, I made a complete recovery. Well, you know what? He can only run that play so many times. He can only run that play so many times. I think this decision is strongly- You know, I agree with your logic. If they had denied him all benefits based on no accident, no causation, you're a liar and it didn't happen. On the state of this record, I wouldn't have any trouble with that. The problem that I have with it is once they found out he actually had an accident and there was a causal relationship between an order and 256 weeks of TTD, so he must have been injured according to them, and then turn around and they say that they adopt the opinions of Dr. Bernstein. And in so adopting the opinions, they find that he reached MMI as of July 14, 2011, and the petitioner was capable of performing work consistent with his January 2009 FCE. The January 2009 FCE says he couldn't work as an iron worker. He could only do minimum work. Revealed full physical effort. Petitioner's job as an iron worker did not provide for life duly. He didn't meet the demands of the position of an iron worker. He could only lift 60 pounds. He could work in a medium demand level. Now, if the commission found that to be true, which they evidently did, then he can't work in the same position he was in on the day he was injured. Whether he should have been working at that position is fairly irrelevant because you take your employee the way you find him. Okay, let's see. I disagree with you, Justice Hoffman, and here's why. The reason the commission awarded that TTD in the face of Dr. Bernstein's opinion is because that's the day Dr. Bernstein gave his deposition. He was not involved in the case. Counsel, you're not even addressing the point I made. You asked me why they awarded that amount of TTD, which of course— No, I didn't ask you why they awarded that amount of TTD. I just told you they did. I asked you how you can explain the commission relying on the January 2009 FCE, which says the guy can't work as an iron worker, he can only do medium demand work, but he was working as an iron worker on the day he was injured. Excuse me. So now the question becomes if he cannot work in the same capacity he was working when he was injured, regardless of whether he should have been working at that capacity, he was. So now how do you deny him a wage differential? Because as Dr. Bernstein testified, those FCE findings were not related to this specific accident. All of that stuff was preexisting. And just because he was back at work doesn't mean if you would have gone out to a job site and subjected him to some type of testing, you wouldn't have found some type of residual disability. And as far as the TTD, like I said, the TTD award was based on the fact that Dr. Bernstein came in later in the case, and the commission apparently didn't want to penalize him because we had Dr. Bernstein testify after he had received years of... Mr. Toddler, this commission would have trashed this man at every corner they had an ability. They believed he was gaming the system. There's no question they believe that. And there's no question there's a basis for their belief. But I have difficulty understanding how a guy can get 256 weeks of TTD, be found in FCE to be incapable of working as an ironworker, and not be entitled to a wage differential when everything says he can't work as an ironworker. Again, that goes back to the fact that Dr. Bernstein did come in until later in the case, and the commission certainly was, you know, if I don't get the opinion and we paid two years of benefits, I can see the commission saying, oh, I'm not going to have the guy go back retroactive. I'm going to go from the date that we had the opinion that he could go back to work. That's why there's an extravagant amount of TTD here. That's why the commission specifically noted in the decision that they were cutting the TTD off based upon the date of Dr. Bernstein's... Well, he said MMI. Dr. Bernstein merely said he was at MMI that day. That's what Bernstein testified to. But it would appear to me that what you're arguing is we're going to give him 256 weeks of TTD, even though we don't think he was injured because we don't want him to have to pay it retroactively. No, they're going to give the TTD until the date that the respondent got the suitable release from Dr. Bernstein. And I don't see any problem with that. Well, then you have to believe that he was temporary and totally disabled up until that date. I think that the way I would phrase that, Joseph Hoffman, is that the respondent didn't have sufficient evidence to terminate the benefits until that date because of the fact that Dr. Bernstein got involved in the case later on and after... Whose burden was it to prove TTD? I'm sorry? Who had the burden of proving that he was temporary and totally disabled until that date? He did. The petitioner does. Right. And if he met the burden, they give him the TTD. And if he didn't meet the burden, they don't. He met the burden. They gave it to him. So he was temporarily and totally disabled from the date of his injury until 256 weeks later. That's it. You've got nothing against that. Again, it's because of the fact that that was the date that Dr. Bernstein testified. So let's look real quickly to cut to the chase. We don't have time. Maximum medical improvement doesn't mean that you haven't gone back to baseline 100%. Does it? No. Okay. Is there anything in this record that suggests that he hadn't gone back to baseline 100% when he is given an MMI? Substantial evidence. Dr. Bernstein specifically testified that he was back, could have gone back to the same job. Whether or not, we can speculate whether or not he had permanent disabilities. But there's certainly evidence in this record that strongly and competently supports the decision that the commission made. And I'd ask your honors to affirm the commission's findings. Thank you. Thank you, counsel. Counsel, you may reply. Thank you. Your honors, what you just heard was essentially the same type of muddying the waters that has been happening this entire case. Ignoring the medical, ignoring the vocational, just talking about how this man has had previous legal issues in the past. He had one previous workers' compensation case that keeps coming up that was settled on a disputed basis based on restrictions in the year 2000. He went back to full-duty work in 2003 because his treating physician released him to full-duty work. The commission, for whatever reason, finds that he couldn't have possibly gotten better. His treating doctor said this man is better. He can go back to full-duty work. That is what happened. There is no reason for the commission to doubt the sincerity of that. Your honor, you're asking a number of questions about the award that was made by the commission and Dr. Bernstein's opinions that the commission says it's relied on. I will tell you what Dr. Bernstein testified to. On cross-examination, Dr. Bernstein agreed that the petitioner's lower back was a major factor restricting his activities in his 2009 FCE. Agreed that since the lower back was a major factor that there is a relationship between his August 14, 2006, work injury and the restrictions from that FCE. And he agreed that Dr. Goldberg's causation opinion was reasonable. He agreed to those things during his testimony. He agreed with Dr. Goldberg, who also agreed with Dr. Comanderi, that the petitioner's restrictions from the 2009 FCE were causally related to his August 14, 2006, work injury. And the commission, as Justice Hoffman pointed out, must have bought into that, awarding at least 256 weeks of TTD and 25 of a man. There is no basis for the commission not to at least award a wage differential benefit. What are we to do with the commission's findings when they're talking about Bernstein? It says he noted that the FCE limitations of 2009 were not related to the petitioner's August 14, 2006, work accident. What are we supposed to do with that money? Your Honor, the evidence shows, Dr. Bernstein's deposition transcript shows that he testified completely opposite on direct examination and cross-examination. On cross-examination, he clearly agreed that the restrictions from the 2009 FCE were causally related to his August 14, 2006, work accident, which is also what Dr. Goldberg and Dr. Comanderi testified to. The manifest way of the evidence in this case is that those restrictions are causally related to his 2009 work—sorry, his 2006 work accident. And the commission awards 25 of a man a large chunk of TTD. There is no basis for the commission not to at least award a wage differential in this case, for he clearly cannot go back to iron work based upon that 2009 FCE, where all the doctors involved in this case agree that that 2009 FCE was from his lower back and his thumb injuries, and that those restrictions keep him out of iron work. Specifically, Your Honors, the commission bought a number of the arguments and copied a number of the arguments that came straight out of a respondent's brief. The respondent pointed out some specific language the commission used. That's the only place you can find it, other than the commission's decision, is the respondent's argument. The arbitrator didn't buy those things. The commission, unfortunately, did. We asked that this court, in reviewing the record, in reviewing the medical and vocational evidence in this case, find that the commission's decision was against the manifest way of the evidence. We ask that you reinstate the permanent total disability that was awarded by the arbitrator, and a minimum award, or a fine that the petitioner is due, wage differential, and remand for calculation. Thank you, counsel. Thank you, counsel, both for your arguments on this matter. We'll be taking an advisement at written disposition shall issue.